In re the **LANDING ASSOCIATES, LTD., Debtor.**

**Bankruptcy No. 90–51358–C.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Nov. 28, 1990.

Adrian M Overstreet, Overstreet, Winn & Edwards, Austin, Tex., for debtor.

H. Rey Stroubbe, III, Akin, Gump, Strauss, Hauer & Feld, Houston, Tex., for creditor, USAT.

1. All references to the Bankruptcy Code and the Rules of Bankruptcy Procedure are by section

## OPINION

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Motion of The Landing Associates, Ltd., for determination of the allowed secured claim of a secured creditor, United Savings Association of Texas, F.S.B., by determining the value of the secured creditor's interest in the subject property pursuant to 11 U.S.C. § 506(a). At the hearing, this court requested supplemental briefs regarding the issues relating to the value of the USAT's interest in the real property and the rents. Upon consideration thereof, the court makes the following findings and conclusions.

## FACTUAL BACKGROUND

The Landing Associates, Ltd. ("Landing" or "Debtor" or "Debtor in Possession") owns a 216–unit apartment complex ("real property") located on a 7.86 acre tract in San Antonio, Bexar County, Texas. The real property is subject to United Savings Association of Texas, F.S.B.'s ("USAT" 's) lien in the original principal amount of $4,888,000.00. USAT's lien consists of a Deed of Trust and Security Agreement, a UCC–1 Financing Statement and a Lease and Rental Assignment, securing the real property, the personal property and the rents from the real property ("the subject property") respectively. All of the documentation was executed in 1982. The Deed of Trust and Security Agreement and the Lease and Rental Assignment were filed in the Official Public Records of Real Property in Bexar County. The personal property covered by USAT's lien has an undisputed value of $20,000.00.

On May 2, 1989, the Debtor filed bankruptcy under Chapter 11 of the Bankruptcy Code.[1] Prior to the filing date, USAT held an undisputed valid security interest in the subject property. On May 26, 1989, USAT filed a "Notice of Perfection of Security

and rule numbers.

Interest in Rents in Lieu of Seizure of Property or Commencement of Action" under Section 546(b). USAT's Proof of Claim lists its debt (on the subject property) owed on petition date as $5,242,988.81 and claims that interest accrues at the per diem contract rate of $2,378.95.

On August 13, 1990, this court entered an Order Authorizing the Use of Cash Collateral in which this court found that USAT had tacitly consented to the use of cash collateral prior to that date. The Debtor in Possession has utilized post-petition rents to pay the operating expenses of the apartment complex. The parties have stipulated that the cash on hand after expenses ("net cash collateral") is $784,971.48 and that such amount is increasing with net rents accruing each month. Not included in the expenses paid out of the gross rents are the property taxes for 1990. The Landing has been escrowing monies to pay the taxes when they become due. USAT, post-petition, unilaterally prepaid the 1990 property taxes.

The issue before this court is the value of USAT's secured claim as determined in accordance with Section 506(a) for the purpose of confirmation.

## DISCUSSION

### I. Outline of the Arguments

In determining the value of USAT's interest in the real property for plan purposes, the Debtor proposes that hypothetical costs of sale should be deducted from the total value of the real property. Secondly, the Landing contends that USAT's interest in rents[2] should not be valued apart from the real estate, arguing that the value of the rents has already been subsumed in the appraised value of the real property. Additionally, the Debtor proposes that the value of USAT's interest in the subject property should be determined as of the petition filing date, and that it should be allowed to use the net cash collateral generated since that date to pay down USAT's date-of-filing secured claim as part of its plan. The Debtor also contends that, because USAT is an undersecured creditor, USAT is not entitled to receive the net rents as adequate protection, as the real property is not declining in value.[3]

USAT counters that this Section 506(a) action is in effect an attempt to determine the validity or extent of USAT's interest in rents and that such a challenge can only be asserted in an adversary proceeding. Alternatively, USAT argues that its interest in rents should be separately valued, independent of and in addition to the value of USAT's interest in the real and personal property to arrive at USAT's total allowed secured claim. This would make USAT an *oversecured* creditor, entitling it to recover its costs, attorneys' fees and post-petition interest.

### II. Scope of the 506(a) Valuation Hearing

■ Section 506(a) and Bankruptcy Rule 3012 provide the mechanism for arriving at the valuation of a secured creditor's interest in property, and by extension, for the setting of the creditor's allowed secured claim. 11 U.S.C. § 506(a); R.Bankr.P. 3012; *In re Saunders*, 112 B.R. 844 (Bankr.W.D.Tex.1990). Generally, the validity, priority and extent of a security interest are determined in an adversary proceeding. Bankr.R. 7001. The Landing has not objected to USAT's Proof of Claim nor

---

**2.** For purposes of this opinion, the general reference to rents means post-petition, post-Section 546(b) notice net rents. The debtor has not attacked the validity of the creation or perfection of USAT's interest in rents and USAT has not laid claim to post-petition rents which accrued prior to the Section 546(b) notice.

**3.** *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 372–373, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988). The Landing correctly asserts that any interest which USAT has in post-petition rents may be used by the debtor so long as USAT is adequately protected. 11 U.S.C. § 363(c).

However, the debtor could also "strip off" at least a portion of the cash collateral (rents) if USAT's debt is less than the total security because the creditor would be oversecured and thus adequately protected. *See In re Bear Creek Ministorage, Inc.,* 49 B.R. 454, 460 (Bankr.S.D. Tex.1985).

has the Landing challenged the validity of USAT's claim to its interest in the real property, the post-petition/post-notice rents from the real property or the personal property. The Landing specifically has not challenged either the creation of USAT's security interest by virtue of the rent assignment or the "perfection" of that interest via the Section 546(b) notice. By the same token, USAT has not claimed entitlement to those rents collected by the debtor post-petition but prior to the Section 546(b) notice. The validity of USAT's interest in rents is thus not here under attack.

The thrust of the Landing's motion is that USAT's interest in the post-petition/post-notice rents has no value over and above USAT's interest in the real and personal property. That issue is so intertwined with the overall valuation issue that no party with an interest can legitimately claim prejudice. As noted by Judge Mahoney in *C.M. Turtur Investments,*

> [T]he issues the parties raise normally are determined in an adversary proceeding ... I am determining the issues raised by the intervenors for the following reasons: (1) the due process requirement of notice to interested parties is not a factor here ... (2) no one is prejudiced by my determination of these issues in this contested matter format ... (3) a hearing of these issues ... is a more efficient use of the judicial system than requiring a separate and distinct adversary proceeding (4) the principal issues to be decided are so related to the collateral issues that a duplication of efforts is avoided ...

*In re C.M. Turtur Investments, Inc.,* 93 B.R. 526, 528 (Bankr.S.D.Tex.1988), *aff'd,* 883 F.2d 35 (5th Cir.1989). The characterization of USAT's interest in rents is far from "adversarial." To the contrary, the court is merely called upon to define the legal nature of the asset to be valued, an inquiry little more remarkable than deciding whether, say, a fixture is realty or personalty. The question does not go to the validity, priority or extent of USAT's interest in property. USAT's Rule 7001 argument is rejected.

### III. Valuation of USAT's Interest
#### A. Timing of the Valuation

Under Section 506(a), a creditor has an allowed secured claim to the extent of the value of such creditor's interest in such property. 11 U.S.C. § 506(a). Courts determine value on a case-by-case basis in light of the purpose of the valuation and the proposed disposition or use of the subject property. S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978) *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5854.

The Landing asserts that, because the purpose of the hearing is to determine the amount of USAT's allowed secured claim, such valuation should be made as of the date of the petition filing. *See In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809 (Bankr.D.N.M.1990). Argues the debtor, any value in the interest in rents which accumulates post-petition would therefore not be added to this allowed secured claim.

The case upon which the Landing relies, however, addressed valuation in the context of allocating adequate protection payments. *See id.* It might well be appropriate to value property as of the filing date in order to evaluate whether a creditor's interest has been adequately protected. After all, the function of adequate protection is to maintain the value of the creditor's interest in the property as of the filing date. *See United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 372–73, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988). When the valuation is for purposes of plan confirmation, however, value must be determined as of *that* date. *See In re Seip,* 116 B.R. 709, 710–711 (Bankr.D.Neb.1990); *Matter of Kain,* 86 B.R. 506, 516 (Bankr.W.D. Mich.1988).

The structure of the statutory provision associated with the treatment of a secured claim in a plan supports this conclusion. A plan may be confirmed over the protestations of a secured creditor provided that the plan provides

(i) (I) that the holders of such claims retain the liens securing such claims, ...

to the extent of the allowed amount of such claims; and

(II) that each holder ... receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, *as of the effective date of the plan,* of at least the value of such holder's interest in the estate's interest in such property ...

(ii) for the sale ... of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale ...

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A) (emphasis added). Similarly, a plan *must* provide to each impaired class who has not accepted the plan

(A) (ii) ... property of a value, *as of the effective date of the plan,* that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title *on such date.*

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, *as of the effective date of the plan,* that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7) (emphasis added). Further, Section 541(a) tells us that the estate may continue to acquire interests in property post-petition, including rents from real estate. 11 U.S.C. § 541(a)(6). Section 552(b) extends a secured creditor's pre-petition interest in rents to post-petition rents acquired by the debtor, unless the court orders otherwise.

■ The inescapable conclusion from the foregoing statutory provisions is that a secured creditor's interest in the estate's interest in property may well *grow* during the pendency of a case, augmenting the secured creditor's secured claim. The *entire* secured claim must be properly treated pursuant to Section 1129 or the plan cannot

be confirmed. The allowed secured claim to which Section 1129 refers must mean the claim allowed *as of confirmation.*

■ Nothing in Section 506(a) itself mandates that the allowed secured claim be fixed as of the filing date for all purposes. To the contrary, that section merely directs that a creditor's claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property," a concept which must necessarily embrace post-petition property to which a secured creditor's interest has attached by virtue of Section 552(b). Section 506(a) also directs that valuation decisions be made "in light of the purpose of the valuation." 11 U.S.C. § 506(a). When the purpose is to determine the allowed secured claim for treatment under the plan, the valuation must include *all* the property subject to the creditor's claim, including property acquired after filing.

■ Because the value of a secured claim for confirmation purposes is determined as of the confirmation date, the value of USAT's interest in rents which have accrued post-petition must be included in that value determination.

### B. Valuation of the Real Property
#### 1. The Appraisals

At the valuation hearing both parties presented appraisal testimony regarding the value of the real property. Although the value of the real property has declined over the past eight years, the appraisers generally agree that during the eighteen months since the petition was filed the property has not declined in value. USAT's appraiser asserted that the market value of the real property should be approximately $4,900,000.00. The Debtor presented appraisal testimony that the market value of the real property should be approximately $4,650,000.00.

The two appraisals were within a generally acceptable 5% margin of error. The difference resulted from the use of different vacancy rates and different maintenance costs. USAT's appraiser used very low vacancy rates and a lower deferred

cost for maintenance than did the Landing's appraiser, who used a slightly higher vacancy rate (taking into account the large number of military personnel living on the premises) and as a whole used more conservative figures for calculating expenses and interest rates. On balance, the debtor's appraisal is the more credible approach.

### 2. Whether Liquidation Costs Should be Deducted From the Appraised Value

■ The Landing argues that it is necessary to deduct hypothetical costs of sale from the foregoing appraised value. USAT claims that liquidation costs should not be deducted from the fair market value of the collateral when the debtor plans to retain the collateral.

Section 506(a) specifically states that value is determined in light of the purpose of the valuation *and the proposed disposition or use of the property.* 11 U.S.C. § 506(a). When the debtor intends to retain the property, the creditor's interest in the property should be determined without regard to hypothetical liquidation costs. *In re Spacek,* 112 B.R. 162, 164 (Bankr.W.D. Tex.1990). The reasoning is simple: because the creditor is not getting the property back it would be artificial to deduct a cost it is not going to incur. *Id.*

The Landing intends in its plan to retain the real property. Thus, hypothetical costs of sale should not be deducted from the appraised value of the real property. The value of USAT's secured interest in the real property is thus found to be $4,650,000.00.

### C. Valuation of the Rent Assignment

We next turn to whether USAT's interest in the rents is a discrete interest which should be separately valued in addition to USAT's interest in the real and personal property.

Section 552(a) provides that pre-petition security interests do not extend to property acquired by the estate post-petition. 11 U.S.C. § 552(a). However, Section 552(b) makes an exception, permitting a creditor's prepetition security interest to extend to post-petition "proceeds, product, offspring, rents or profits" of or from collateral, provided that the security agreement expressly grants an interest in such property and further provided that the security interest has been perfected under "applicable non-bankruptcy law." 11 U.S.C. § 552(b); *see Wolters Village, Ltd. v. Village Properties, Ltd. (Matter of Village Properties, Ltd.),* 723 F.2d 441, 443 (5th Cir.), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *see also Butner v. United States,* 440 U.S. 48, 55–57, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136 (1979) (existence of security interest must be resolved by reference to state law). The Landing does not question the validity either of USAT's security interest in rents in general or of USAT's "perfection" of its interest in the post-petition/post-notice rents in particular. It *does* challenge USAT's characterization of that interest. This court must therefore decide just what an interest in rents is in order to assign a value to that interest.

■ A brief review of Texas law regarding assignments of rents is imperative. Texas adheres to the lien theory of mortgages, under which the mortgagee is not the owner of the property and so is not entitled to outright possession of the property or to its rentals or profits until the lien is enforced. *Taylor v. Brennan,* 621 S.W.2d 592, 593 (Tex.1981). Rentals may be separately assigned as collateral to the mortgagee either within the deed of trust or in a separate agreement. *Id.* at 593–594. In the instant case, it is undisputed that the rent assignment constitutes a pledge to secure a debt and as such creates a security interest in the rents.

■ The Texas Supreme Court in *Taylor* followed the common law rule that an assignment or pledge of rents does not become "operative" until the mortgagee obtains possession of the property, impounds the rents, secures the appointment of a receiver or takes some similar action. *Id.*

at 594.[4] The Fifth Circuit has applied *Taylor* to determine whether a mortgagee has an interest in rents post-petition. *In re Casbeer v. State Federal Savings & Loan Ass'n. (In re Casbeer)*, 793 F.2d 1436 (5th Cir.1986); *Matter of Village Properties, Ltd.*, 723 F.2d 441 (5th Cir.1984); *see also In re Lake Austin Centre Joint Venture*, 106 B.R. 106, 108 (Bankr.W.D.Tex.1989). According to the Fifth Circuit, bankruptcy's automatic stay precludes a creditor from taking the *Taylor v. Brennan* "perfection" steps, i.e., entering the premises to obtain possession.[5] The court adds in *dicta* that post-petition "perfection" of an interest in rents can be accomplished by the creditor's filing a notice of perfection under Section 546(b). *Casbeer*, 793 F.2d at 1443.

The notion of a post-petition "perfection" of an interest in rents has been soundly criticized recently. *See National Real Estate Ltd. Partnership–II v. Consolidated Capital Properties (In re National Real Estate Ltd. Partnership–II)*, 104 B.R. 968, 970–971 (Bankr.E.D.Wis.1989) (construing Texas law); Conti, *Distinguishing Perfection from Enforcement Assignment of Rents: There's Hope for Secured Creditors*, 3 Bankr.Couns. ¶ 933 (October 22, 1990); Averch, *Revisitation of the Fifth Circuit Opinions of Village Properties and Casbeer: Is Post–Petition "Perfection" of an Assignment of Rents Necessary to Characterize Rental Income as Cash Collateral?*, 93 Com.L.J. 516 (1988). These authorities point out that the language and meaning of the term "operative" as used in *Taylor* has been deeply misconstrued. Nowhere in *Taylor* (or in other decisions following *Taylor*) is a creditor required to take affirmative steps to take possession of the rents to *perfect* its security interest, as that term is commonly used in secured transactions and mortgage law. *Taylor* does not address how to "perfect" an interest in rents *vis-a-vis* other creditors. It addresses how a creditor actually asserts its superior right to the rents *vis-a-vis* the debtor. In other words, the term "make operative" as used in *Taylor* must perforce refer to *enforcement*, not perfection.[6]

4. On the other hand, an absolute assignment of rents operates to transfer the right and title to rentals automatically upon the happening of a specific condition such as default. *Id.* An absolute assignment does not create a security interest but instead passes title to the rents. *Id.*

5. In fact, *Taylor* described the steps necessary to make the interest in rents "operative." As discussed below, this concept relates to *enforcement* rather than *perfection*.

6. "Perfection" generally refers to the notice of the existence of a security interest that its holder gives to third parties to preserve its priority claim on the collateral. Perfection is normally accomplished via some form of filing or recordation, unless the security interest is one which is automatically perfected or can be perfected only by possession. Nothing in Texas law suggests that possession is the sole means by which an interest in rents may be perfected *vis-a-vis* third party creditors. *Taylor* was not a lien priority case. It was a lien enforcement decision.

A deed of trust gives a creditor the right to foreclose on the real property in the event of a default, but not before certain notice steps are taken by the creditor. No one would seriously maintain that this foreclosure notice has anything to do with the creditor's *perfecting* its interest in the real property. All agree that perfection of that interest is accomplished by recording the deed of trust in the real estate records in the county in which the property is located. *See* Tex.Prop.Code Ann. § 51.002 (Vernon Supp.1990). An interest in a rents can also be recorded, like any other interest in real estate, thus giving notice to third parties of the asserted security interest. There is little reason to use a different rule for rent assignments than for deeds of trust.

*Casbeer* and *Village Properties* seem to suggest that a lender's interest in rents is "inchoate" until affirmative possession steps are taken. However, such an interest is no more inchoate than an interest in, say, accounts receivable. A lender also enforces its security interest in accounts receivable by taking possession of them, yet no one contends that a "notice of perfection" needs to be filed in bankruptcy with respect to accounts receivable to make the security interest "effective." To the contrary, a lender must either have a perfected interest in accounts receivable pre-petition or risk having its security interest avoided by a trustee. 11 U.S.C. § 544(a). The Bankruptcy Code permits an interest in future accounts receivable to continue post-petition if it falls within the rubric of Section 552(b) just as it permits an interest in rents to continue post-petition. The rules which apply to receivables should apply to rents as well.

The basic principle in adjudicating priorities of competing liens is "first in time first in right." *Rice Investments v. United States*, 625 F.2d 565, 568 (5th Cir.1980). Surely a creditor who is

The creditor here is owed one debt, but has three interests which secure that debt: a deed of trust, an assignment of rents and the security interest in personal property. *See In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 460 (Bankr.S.D.Tex.1985). The Landing does not contest that USAT has three interests. It only contends that the interest in rents has no value because it is subsumed into the valuation of the income-producing property. This is simply not correct.

An assignment of rents grants a creditor the power, upon the completion of certain acts, to take possession of the rents in the event of a default. *See Taylor v. Brennan*, 621 S.W.2d at 594. A deed of trust merely allows the creditor to foreclose on the real property itself in the event of a default (after proper notice). *See Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1978); *Phillips v. Campbell*, 480 S.W.2d 250, 253 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd. n.r.e.); Tex.Prop. Code Ann. § 51.002 (Vernon Supp.1990). A creditor with a deed of trust *and* an assignment of rents can not only foreclose on the real property but can also seize the rents *before* foreclosing on the real property. It is this extra bundle of rights which the assignment of rents confers, a set of rights not conferred by a deed of trust alone. *Taylor v. Brennan* describes how one enjoys the bundles of rights which an assignment of rents confers—a bundle of rights decidedly distinct from those conferred by a deed of trust alone.

When a debtor files bankruptcy, the automatic stay prevents the lender holding this bundle of rights from enjoying them. The rents collected post-petition are presumed to be rents which, *but for* the bankruptcy, would have been collected by the lender under its assignment of rents. A lender with only a deed of trust lacks the extra bundle of rights which would permit it to benefit from the operation of Section 552(b), i.e., a lender, by virtue of its deed of trust alone, could not collect rents prior to foreclosure. Just as we afford adequate protection to a lender with a mere deed of trust as though it would have foreclosed on the property and enjoyed the full benefits of its deed of trust as of the filing date but for the bankruptcy filing, we similarly afford adequate protection to the secured creditor with an assignment of rents, on substantially the same terms (but for the "notice of perfection" step interposed by the Fifth Circuit). Thus an assignment of rents confers rights which have discrete value apart from the underlying deed of trust interest in the real property generating those rents.

The way appraisers value real property further supports this observation. Both appraisers in this case testified to the three general approaches appraisers use to value real property (income, comparable sales, and replacement cost). No one approach by itself yields the true value of the property. Income-producing property is not merely worth the present value of a net income stream. Current real estate market conditions and the cost of construction also must be taken into account. Appraisers can only derive sensible discount rates for developing an anticipated income stream by evaluating the price for which other properties are now selling (an indicator of the level of risk the current marketplace will support). Similarly, replacement costs, if low enough in a recessionary market, can affect one's conclusions about the value of an income stream because an investor who could build a new building for little enough to generate similar income might not even be willing to buy an existing building. The three approaches are co-dependent as well as co-indicative. The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice*, Standard 1 (1987).

---

first to record its assignment of rents would take priority over a subsequent judicial lien creditor attempting to garnish those very rents. *Cf. San Felipe Nat'l Bank v. Caton*, 668 S.W.2d 804, 805 (Tex.App.—Houston [14th Dist.] 1984, no writ) (citing *Beggs v. Fite*, 130 Tex. 46, 106 S.W.2d 1039, 1042 (1937)). If the interest is sufficiently perfected under state law to cut off the rights of third parties, it should be adequately perfected for bankruptcy purposes as well. *See* 11 U.S.C. § 544(a). No further perfection steps should be necessary.

What appraisers are valuing (or predicting) is what someone would be willing to pay to *own* the property and enjoy its fruits. The income approach measures the *ability* of the property to produce a return on investment (via an income stream) that would justify a buyer's paying the indicated market value to own the property. The right to specific rents *prior* to ownership of the property, conferred by an assignment of rents, is *a priori* not calculated into this value. It is thus possible for appraisers to conclude that income producing property has the same value at two different points in time even though income has been generated in the interim. That is what happened here. It could not have happened if the value of income-producing property were merely a function of its stream of income. The income approach more precisely values *the ability to produce income*, rather than the income itself.

The appraisals only valued the interest conferred by USAT's deed of trust. They did not purport to value the wholly separate interest conferred by USAT's assignment of rents, which represents USAT's entitlement to rents *prior* to foreclosing on the property. To be sure, the appraisals examine the rental stream, but only in the context of its representing the income *capacity* of the property *after* its sale (by foreclosure or otherwise).

 The valuation of rents which have accrued to augment the lender's collateral package is not difficult. In this case, USAT has only asserted an interest in the net rents after monthly operating expenses have been paid.[7] The value of USAT's interest in this cash collateral is the dollar value of the stipulated net amount plus the net rents which have accrued or will be collected up to the date of confirmation.

### IV. Matters Relating to USAT's Interest in Collateral

 The total value of the cash collateral as of confirmation added to the value of the real property and the personal property will yield a total collateral value of at least $5,704,971.48. Thus, the value of the collateral exceeds the amount of USAT's prepetition claim. Therefore, USAT has an allowed secured claim equal to the lesser of that total collateral value or the amount of money the estate owes USAT. *See* 11 U.S.C. § 506(b); *In re Flagler–At–First Assoc., Ltd.,* 114 B.R. 297, 301–302 (Bankr.S.D.Fla.1990); *Matter of Kain,* 86 B.R. 506, 513 (Bankr.W.D.Mich. 1988); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 826 (Bankr.S.D.N.Y.1982). USAT is thus entitled to post-petition interest, costs and fees to the extent of its interest in the Debtor's property. *See United States v. Ron Pair Enterprises,* 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *see also United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 372–374, 108 S.Ct. 626, 630–32, 98 L.Ed.2d 740. Post-petition interest on USAT's oversecured claim is calculated at the federal judgment rate. *In re Laymon,* 117 B.R. 856, 864 (Bankr.W.D.Tex.1990).

 The underlying agreement provides for the payment of costs and attorneys' fees, so USAT may collect those expenses to the extent of the value of the collateral as of confirmation. 11 U.S.C. § 506(b); *In re Hudson Shipbuilders, Inc.,* 794 F.2d 1051, 1054 (5th Cir.1986). USAT may charge attorneys' fees (pre or post-petition) to the extent of the value of the collateral.[8]

---

**7.** Whether the perfected lien on rents extends to the gross rents or to the net rents (after operating expenses have been paid) is not completely clear. *See e.g., In re Parham,* 72 B.R. 604 (Bankr.M.D.Fla.1987); *In re Coniam,* 9 B.R. 306 (Bankr.D.Conn.1981); *In re Oak Glen R–Vee,* 8 B.R. 213 (Bankr.C.D.Cal.1981). This court determines that the lien extends to the net rents after Section 506(c) expenses have been deducted mostly because the parties have not argued otherwise. The language of Section 506(b) pre-

sumes that a Section 506(a) valuation is always net of Section 506(c) charges. 11 U.S.C. § 506(b).

**8.** The application of Section 506(b) employed here essentially follows a snapshot model. The court at a discrete moment (e.g., confirmation) totes up debt owed by the estate as of that date (including post-petition interest, attorneys' fees, and other charges), adds them to the pre-petition claim, then pays the total out of (and to the extent of) the total value of the collateral as of

USAT's prepayment of property taxes, accomplished post-petition without court approval amounts to a unilateral extension of credit foisted upon the debtor. The proper procedure for extending credit on a secured basis to an estate is provided in Section 364(c). USAT elected not to follow this course and did so at its own peril. *See* 11 U.S.C. § 364(c). If USAT had paid the taxes pre-petition it might have been able to wrap the payment into the pre-petition debt. However, post-petition, USAT may not unilaterally create debt by voluntarily paying debts for the estate without court approval.[9] Although property taxes may be a "cost" of maintaining real property, the Landing had already set aside the money out of the rents to pay the taxes when they came due. USAT's payment was purely voluntary. The estate does not owe USAT for this involuntary extension of "credit," and the taxes paid thus cannot be added to USAT's secured claim.

## CONCLUSION

The value of USAT's secured interest in the real property is $4,650,000.00. The value of USAT's interest in the personal property is $20,000.00. The value of USAT's interest in the cash collateral (which is the stipulated amount of post-petition, post-notice rents net of expenses, plus the net rents which have accrued or will be collected subsequent to August 31, 1990) is added to the value of USAT's interest in the real and personal property to equal the value of USAT's interest at confirmation.

The value of USAT's interest in the subject property at the date of confirmation will exceed the amount of USAT's claim

asserted as of the petition filing date. As an oversecured creditor, USAT is entitled to increase its petition date claim to the value of its collateral to recover post-petition interest (at the federal judgment rate), costs and fees up to the value of its interest in the debtor's property. These costs include attorneys' fees but exclude the prepaid 1990 property taxes.

Counsel for USAT is directed to submit a form of order consistent with this opinion.

---

that date. The "snapshot" model is, in my view, more faithful to the language and structure of Section 506 than is the "timeclock" or "stopwatch" model proposed by the debtor (which would "turn on" the interest and fees clock only at the point the lender "becomes" oversecured, turning it off again when the collateral value is used up). This latter model is cumbersome, requiring multiple valuations throughout the bankruptcy case. The timeclock approach also overlooks the essentially distributive function of bankruptcy proceedings. Even chapter 11 reorganizations are couched in terms of delivering to creditors property of a value at least equivalent to what they would receive in a chapter 7 liquidation in satisfaction of their claim. 11 U.S.C. § 1129(a)(7). The snapshot model more naturally fits into the confirmation process.

9. USAT had a variety of remedies with which to protect itself: 1) USAT could have purchased the tax claim; 2) months ago, USAT could have moved for relief from or a modification of the automatic stay to pay the taxes; or 3) USAT could have let the Landing pay the taxes out of the funds escrowed for that purpose.